UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - X
BFI GROUP DIVINO CORPORATION,              :        **ECF CASE**

                    Plaintiff,             :

        - against -                        :        06 Civ. 2093 (WCC)

JSC RUSSIAN ALUMINUM  d/b/a RUSAL, a       :
foreign corporation; JSC BRATSK
ALUMINUM PLANT, a foreign corporation;     :        **OPINION**
RUSAL AMERICA CORP., a Delaware                     **AND ORDER**
corporation; DAYSON HOLDING LTD., a        :
foreign corporation; and DOES 1-20,
inclusive,                                 :

                    Defendants.    :
- - - - - - - - - - - - - - - - - - X


**A P P E A R A N C E S :**

                                    BURNHAM BROWN
                                    **Attorneys for Plaintiff**
                                    1901 Harrison Street, 11th Floor
                                    Oakland, California 94612

JIMMIE L. WILLIAMS, ESQ.
ROBERT M. BODZIN, ESQ.
JOHN J. VERBER, ESQ.
DEREK H. LIM, ESQ.

        Of Counsel


                                    GIBSON, DUNN & CRUTCHER LLP
                                    **Attorneys for Defendants**
                                    200 Park Avenue, 47th Floor
                                    New York, New York  10166-0193

RANDY M. MASTRO, ESQ.
MARSHALL R. KING, ESQ.
KATHRYN E. NEALON, ESQ.

        Of Counsel


                                    **Copies E-Mailed to Counsel of Record**

**CONNER, Senior D.J.:**

Plaintiff BFI Group Divino Corporation brings this action for tortious interference with contractual relations, tortious interference with prospective business advantage, unfair competition and conspiracy to commit fraud against defendants JSC Russian Aluminum d/b/a RUSAL ("RUSAL"), JSC Bratsk Aluminum Plant ("Bratsk"), RUSAL America Corp. ("RUSAL America"), Dayson Holding Ltd. ("Dayson"), and "Does 1-20," several unnamed agents of the aforementioned corporate defendants (collectively, "defendants"). Plaintiff's allegations stem from defendants' alleged corruption of several Nigerian government officials, including the president of the Federal Republic of Nigeria, in connection with the privatization of a publicly-owned Nigerian aluminum facility. Defendants now move to dismiss plaintiff's claims in their entirety, citing plaintiff's failure to plead fraud with particularity pursuant to FED. R. CIV. P. 9(b), lack of subject matter jurisdiction pursuant to FED. R. CIV. P. 12(b)(1), lack of personal jurisdiction pursuant to FED. R. CIV. P. 12(b)(2), insufficiency of service of process pursuant to FED. R. CIV. P. 12(b)(5), failure to state a claim upon which relief can be granted pursuant to FED. R. CIV. P. 12(b)(6) and the common law doctrines of *forum non conveniens*, international comity, collateral estoppel and the act of state doctrine. For the reasons that follow, defendants' motion is granted.

## BACKGROUND

Plaintiff's complaint alleges the following facts. In 1999, the government of Nigeria promulgated the Public Enterprises (Privatization and Commercialization) Act, and went about divesting certain state-owned companies and assets. (Complt. ¶¶ 2-3.) One such asset was a majority interest in the Aluminum Smelter Company of Nigeria ("ALSCON") and all of its facilities. (*Id.*)

1

The sale was overseen by the Nigerian Bureau of Public Enterprises ("BPE"). (*Id.* ¶ 2.) Plaintiff and Dayson, a British Virgin Islands company, acting on behalf of RUSAL and Bratsk, a RUSAL affiliate, expressed interest in acquiring ALSCON, as did Ferrostaal AG, the company then managing the ALSCON facility pursuant to a prior agreement with the Nigerian government. (*Id.* ¶ 5.) Bids were to be submitted in sealed envelopes, one containing a document detailing the bidder's technical ability to run ALSCON and the other containing a document setting forth the financial amount of the bid. (*Id.* ¶ 63.) The technical bids were to be opened immediately, whereas the financial bids were to be opened simultaneously at a televised ceremony in Nigeria later in the year. (*Id.* ¶¶ 63-64.) On March 24, 2004, following evaluation of its technical bid, Ferrostaal AG was disqualified from the financial bidding process. (*Id.* ¶ 66.) The General Manager of ALSCON, a Ferrostaal AG employee, informed plaintiff that his employer had been disqualified because the Nigerian government already had promised the facility to RUSAL. (*Id.* ¶ 67.) RUSAL and plaintiff submitted their bid packages on April 19, 2004 and April 20, 2004 respectively. (*Id.* ¶¶ 68-73.)

On April 28, 2004, the BPE informed plaintiff that its technical bid had been accepted and that it was thus qualified for participation in the next round of the bidding process. (*Id.* ¶ 75.) At the prompting of the BPE, however, plaintiff, along with RUSAL, attended a technical bid conference on May 20, 2004, at which the BPE informed the parties of certain bidding procedures, as well as financial obligations accompanying the acquisition of ALSCON. (*Id.* ¶¶ 75-78.) The parties were given until June 4, 2004 to revise their bids to accommodate the new information. (*Id.* ¶ 78.) On May 23, 2004, plaintiff delivered to the BPE an affirmation indicating that it had accepted the terms proposed at the May 20, 2004 technical bid conference. (*Id.* ¶ 81.) At the same time, it informed the BPE's General Director, Julius Bala, that it was concerned that RUSAL had been

2

promised the ALSCON facility. (*Id.*) Bala informed plaintiff that Nigerian President Olusegun Obasanjo had directed his National Security Advisor, General Aliyu Gusau, to assist RUSAL in forming its bids in order to increase its chances of acquiring ALSCON. (*Id.*) Two days later, plaintiff's representatives met personally with President Obasanjo, who assured them that he had not made any prior agreement to award the contract to RUSAL. (*Id.* ¶ 86.)

On June 14, 2004, the sealed financial bids were opened. (*Id.* ¶ 91.) Plaintiff submitted the high bid of $410 million. (*Id.* ¶¶ 95-96.) RUSAL, on the other hand, was disqualified for submitting a $205 million conditional[1] bid in violation of the terms of the bid documents, which required that all bids be unconditional. (*Id.* ¶¶ 68, 93.) Following RUSAL's disqualification, the BPE declined to enter into a purchase agreement with plaintiff, although it allegedly had prepared a letter awarding plaintiff the bid, but was ordered by President Obasanjo to delay its delivery. (*Id.* ¶ 96.) Following the bid-opening ceremony, President Obasanjo dissolved the National Council on Privatization (the entity administering the bidding process) and assumed personal control over its functions. (*Id.* ¶ 97.) On June 17, 2004, plaintiff received a letter from the BPE stating that it was the winning bidder and instructing it to tender ten percent of the purchase price within fifteen business days from receipt of the letter. (*Id.* ¶ 101.) Plaintiff objected to tendering payment prior to the signing of a final purchase agreement, as was provided in the original bid contract. (*Id.* ¶ 102.) The BPE then attempted to

---

[1] According to plaintiff's complaint, RUSAL's bid was conditioned on the Nigerian government's: (1) waiver of the requirement that ten percent of the bid price be submitted within fifteen working days of executing the ALSCON purchase agreement; (2) waiver of the requirement that the remainder of the bid price be paid within ninety days; (3) cancellation or satisfaction of all ALSCON debts; (4) indemnification of RUSAL for certain contractual claims against ALSCON; (5) agreement to dredge a river running from ALSCON to the Atlantic Ocean; (6) agreement to supply natural gas to ALSCON at a stipulated rate; and (7) renewal of a law allowing ALSCON to export its products without being subject to tariffs. (Complt. ¶ 70.)

3

modify the terms of the purchase agreement[2] and, despite plaintiff's attempts to negotiate, the BPE

sent plaintiff a letter on July 9, 2004 stating that it had been disqualified from the bidding process.

(*Id.* ¶¶ 102-107.) On February 3, 2006, RUSAL purchased ALSCON for $250 million, $160 million

less than plaintiff's bid.  (*Id.* ¶ 108.) Plaintiff subsequently sued the Nigerian government in the

Federal High Court of Nigeria for the Abuja Judicial Division, which held that no contract existed

between plaintiff and the Nigerian government.  (*See* Omo Decl., Ex. A.) Although plaintiff has

appealed that decision, no decision has yet been rendered on appeal.

 Plaintiff subsequently filed the instant Complaint, which defendants now move to dismiss

on the grounds of: (1) failure to plead fraud with particularity pursuant to FED. R. CIV. P. 9(b); (2)

lack of subject matter jurisdiction pursuant to FED. R. CIV. P. 12(b)(1); (3) lack of personal

jurisdiction pursuant to FED. R. CIV. P. 12(b)(2); (4) insufficiency of service of process pursuant to

FED. R. CIV. P. 12(b)(5); (5) failure to state a claim upon which relief can be granted pursuant to FED.

R. CIV. P. 12(b)(6); (6) *forum non conveniens*; (7) international comity; (8) collateral estoppel; and

(9) the act of state doctrine.  For the reasons that follow, defendants' motion is granted pursuant to

the doctrine of *forum non conveniens*.[3]

---

 [2] Plaintiff states in its Complaint that "[t]he new [purchase agreement] contained altered payment terms, and noted that [plaintiff] could not, for six months after paying the full purchase price, without the consent of the BPE, borrow against the assets, trade credit and similar facilities of the company.  The [new purchase agreement] also sought to prohibit [plaintiff] from changing ALSCON's auditors, from altering the employment status of any employee during this six month period, and have [plaintiff] declare that ALSCON's unverified accounting statements accurately set forth the assets and liabilities of the company." (Complt. ¶ 102.)

 [3] Accordingly, we need not address defendants' other possible bases for dismissal.

4

## DISCUSSION

The doctrine of *forum non conveniens* permits a court, in its discretion, "to resist the imposition upon its jurisdiction," even though jurisdiction may be lawfully exercised and venue technically proper, where the convenience of the parties and the interests of justice favor dismissal. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947); *Koster v. Lumbermens Mut. Casualty Co.*, 330 U.S. 518, 527 (1947). Dismissal is appropriate where "trial in the plaintiff's chosen forum imposes a heavy burden on the defendant or the court, and where the plaintiff is unable to offer any specific reasons of convenience supporting his choice." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249 (1981). In exercising its discretion, a court is steered by the guideposts established by the Supreme Court in *Gilbert*, 330 U.S. at 508-09, and reinforced in *Piper*, 454 U.S. at 241 n.6, that direct a court to examine the "private interest factors" relating to the convenience of the litigants, as well as the "public interest factors" relating to the convenience of the forum and the ends of justice. *Gilbert*, 330 U.S. at 508-09; *Alcoa S.S. Co. v. M/V Nordic Regent*, 654 F.2d 147, 150-51, 151 n.4 (2d Cir. 1980) (*en banc*); *Monsanto Int'l Sales Co. v. Hanjin Container Lines Ltd.*, 770 F. Supp. 832, 835 (S.D.N.Y. 1991).

Because the doctrine of *forum non conveniens* presupposes at least two fora in which the action may proceed, the Court must initially determine whether an adequate alternative forum in fact exists. *Gilbert*, 330 U.S. at 506-07; *Piper* 454 U.S. at 254 n.22. Once the availability of an alternate forum is established, the Court weighs, in its sound discretion, the pertinent private and public interest factors to assess whether dismissal from the present forum is appropriate. *Piper*, 454 U.S. at 256; *In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in Dec. 1984*, 634 F. Supp. 842, 845 (S.D.N.Y. 1986), *aff'd* as modified by 809 F.2d 195 (2d Cir.), *cert. denied*, 484 U.S. 871

5

(1987). Application of the factors enunciated in Gilbert varies depending on the unique facts of each case; the inquiry is intended to be flexible, with no particular emphasis on any single factor. *See Ernst v. Ernst*, 722 F. Supp. 61, 64 (S.D.N.Y. 1989) (citing *Piper*, 454 U.S. at 249-50).

Defendants bear the overall burden of showing that the circumstances warrant dismissal. *Schertenleib v. Traum*, 589 F.2d 1156 (2d Cir. 1978). Ordinarily, courts exercise a degree of deference to a plaintiff's choice of forum, which is overcome only where public and private interest factors point clearly toward trial in an alternate forum. *Gilbert*, 330 U.S. at 508.

## I.    Degree of Deference Afforded to Plaintiff's Chosen Forum

As a preliminary matter, we must address the degree of deference to be paid to plaintiff's choice of forum. Generally, an American plaintiff's choice of a United States forum is entitled to significant deference. *See Iragorri v. United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001). Nonetheless, although a "plaintiff's citizenship and residence can serve as a proxy for, or indication of, convenience, neither the plaintiff's citizenship nor residence, nor the degree of deference given to her choice of forum, necessarily controls the outcome." *Id.* at 74. The courts do not apply "'a talismanic significance to the citizenship or residence of the parties,'" *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 102 (2d Cir. 2000), and thus "'[w]here an American plaintiff chooses to invest in a foreign country and then complains of fraudulent acts occurring primarily in that country, the plaintiff's ability to rely upon citizenship as a talisman against *forum non conveniens* dismissal is diminished.'" *Base Metal Trading SA v. Russian Aluminum*, 253 F. Supp. 2d 681, 696 (S.D.N.Y. 2003) (internal quotation marks omitted) (quoting *Sussman v. Bank of Israel*, 801 F. Supp. 1068, 1073 (S.D.N.Y. 1992), *aff'd*, 990 F.2d 71 (2d Cir. 1993)).

6

## II.    Existence of an Adequate Alternative Forum

We now address whether there is an adequate alternative forum for adjudication of plaintiff's claims. *Gilbert*, 330 U.S. at 506-07. Defendants contend that the present action should be dismissed because both Nigeria and the Russian Federation constitute adequate alternative fora. Because we conclude that the present case is properly adjudicated in courts of the Federal Republic of Nigeria, we need not address whether the courts of the Russian Federation also would constitute an adequate forum. "An alternative forum is generally adequate if: (1) the defendants are subject to service of process there; and (2) the forum permits litigation of the subject matter of the dispute." *Bank of Credit & Commerce Int'l (Overseas) Ltd. v. State Bank of Pakistan*, 273 F.3d 241, 246 (2d Cir. 2001) (internal quotation marks omitted).

### A.    Whether Defendants are Subject to Service of Process in Nigeria

In the present case, each defendant has agreed to appear in the Nigerian courts. (Defs. Mem. Supp. Mot. Dismiss at 10.) Having reviewed the Civil Procedure Rules of the Nigerian High Court of the Federal Capital Territory (the "High Court Civil Procedure Rules"), Abuja Division, we have no reason to doubt the assertion of defendants' Nigerian legal expert, Justice Uche Omo,[4] that the High Court of the Federal Capital Territory would exercise jurisdiction over the present matter and permit service of process on defendants. The High Court Civil Procedure Rules expressly provide for service of process on parties residing outside the jurisdiction when "the action is founded on a tort or other civil wrong committed within the jurisdiction . . . ." *See* High Court Civil Procedure

---

[4] Justice Omo is admitted to the bar in both England and Nigeria and served as a judge on several Nigerian courts, including the Supreme Court of Nigeria from 1991-1993. (Omo Decl. ¶¶ 1-2.)

7

Rules, Order 12, Rule 13(f) ("Service out of jurisdiction of a writ of summons or notice of a writ of summons may be allowed by the Court or a Judge in chambers whenever . . . the action is founded on a tort or other civil wrong committed within the jurisdiction . . . ."). Furthermore, High Court Civil Procedure Rules, Order 10, Rule 4(1) provides that jurisdiction is proper within the High Court "where the cause of action arose in the Federal Capital Territory, Abuja."

Additionally, we note that defendants have stated that they will consent to jurisdiction in Nigeria. (Defs. Mem. Supp. Mot. Dismiss at 10.) *Cf. Jota v. Texaco Inc.*, 157 F.3d 153, 159 (2d Cir. 1998) ("Accordingly, dismissal for *forum non conveniens* is not appropriate, at least absent a commitment by [the defendant] to submit to the jurisdiction of the Ecuadoran courts for purposes of this action."); *In re Union Carbide Corp. Gas Plant Disaster*, 809 F.2d at 203-04 (affirming dismissal for *forum non conveniens* and noting that condition that defendant submit to jurisdiction India was "not unusual and ha[d] been imposed in numerous cases where the foreign court would not provide an adequate alternative in the absence of such a condition"). Despite plaintiff's contention that this Court is the proper venue for adjudication of the present matter, its own Nigerian legal expert, Professor Charles Udenze Ilegbune,[5] concedes that jurisdiction and venue both properly lie in the Nigerian High Court for the Federal Capital Territory, although he contends that the United States is a better forum. (*See* Ilegbune Decl. ¶ 4.i.) We thus conclude that the first element of our adequate alternative forum inquiry is satisfied.

---

[5] Professor Ilegbune presently is serving as Dean of Law at the University of Abuja, Nigeria, a position that he has held since 1998. (*See generally* Ilegbune Aff.)

8

**B.**     <u>Whether Nigerian Law Permits Litigation of the Subject Matter of the Dispute</u>

Plaintiff's Complaint states four causes of action against defendants, namely: (1) tortious interference with contractual relations; (2) tortious interference with prospective business advantage; (3) unfair competition; and (4) conspiracy to commit fraud.  (*See* Complt. ¶¶ 124-54.) Plaintiff contends that California law governs the present action, whereas defendants contend that Nigerian law applies.

Without ruling on the applicability of California law, we believe it instructive to compare it to the law of Nigeria.  Under California law, the

> elements [of the tort of interference with prospective business advantage] are usually stated as follows: (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant. . . .

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153, 63 P.3d 937, 131 Cal. Rptr. 2d 29 (2003) (internal quotation marks omitted).  Additionally, California law requires that a plaintiff demonstrate that "the defendant's interference was wrongful by some measure beyond the fact of the interference itself," *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 392-93, 902 P.2d 740, 45 Cal. Rptr. 2d 436 (1995), although a plaintiff need not go so far as to prove that the defendant's *sole specific purpose* in committing the wrongful act was to interfere with the plaintiff's prospective business advantage.  *Korea Supply*, 29 Cal. 4th at 1154 ("The question is whether a plaintiff must plead and prove that the defendant engaged in wrongful acts *with the specific intent* of interfering with the plaintiff's business expectancy.  We conclude that specific intent is not a required element of the tort of interference with prospective economic advantage.")

9

(emphasis in original).

As the *Korea Supply* court observed, "'the tort of interference with contract is merely a species of the broader tort of interference with prospective economic advantage.'"[6] 29 Cal. 4th at 1157. Thus, in order to state a claim for tortious interference with contractual relations, a plaintiff must prove the existence of: "'(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.'"[7] *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55, 960 P.2d 513, 77 Cal. Rptr. 2d 709 (1998).

Plaintiff also alleges the existence of a civil conspiracy to commit fraud. (Complt. ¶¶ 147-53.) Under California law, "[t]he elements of an action for civil conspiracy are (1) formation and operation of the conspiracy and (2) damage resulting to plaintiff (3) from a wrongful act done in furtherance of the common design." *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1062, 128 P.3d 713, 39 Cal. Rptr. 3d 516 (2006). The viability of a civil conspiracy claim, however, depends on the existence of the underlying tort, in this case fraud. *Id.* Under California law, "[t]he elements of fraud are: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or *scienter*); (3) intent to defraud, *i.e.*, to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 990,

---

[6] The court recognized, however, that the two theories constituted independent causes of action and that, under certain circumstances, a plaintiff could maintain claims under each. *Korea Supply*, 29 Cal. 4th at 1157.

[7] We note, however, that the existence of a contract between plaintiff and the Nigerian government is a separate issue as to which plaintiff is currently involved in extensive litigation in the courts of that country.

102 P.3d 268, 22 Cal. Rptr. 3d 352 (2004).

Finally, plaintiff asserts a cause of action for common law unfair competition, which is ill-defined by California law.

> At common law, before the enactment of any statutory prohibition against unfair competition, "unfair competition" had a stable and relatively narrow meaning that focused on business practices that harmed competitors by deceiving customers. . . . Originally, it was the deceptive "passing off" of one's goods or services as those of another, commonly accomplished by appropriating the trade name of another.
> . . . .
> Even though the tort has been extended to situations other than classic "passing off," deceptive conduct has remained at the heart of unfair competition. As [the California Supreme Court has previously stated,] the principles of unfair competition apply to all cases where fraud is practiced by one in securing the trade of a rival dealer; and these ways are as many and as various as the ingenuity of the dishonest schemer can invent.

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 193, 973 P.2d 527, 83 Cal. Rptr. 2d 548 (1999) (internal quotation marks omitted; citations omitted).

As Justice Omo details, Nigerian law contains analogues for three of the aforementioned causes of action, each requiring proof of similar elements to sustain a claim. (*See* Omo Decl. ¶¶ 12-16.) For example, under Nigerian law, a party commits the tort of procuring a breach of contract when: (1) there is an existing contact between two parties; (2) the party has knowledge of the contract's existence; (3) the party, without excuse or justification, intentionally interferes with performance of the contract by either persuading one of the contracting parties to breach the contract or preventing a contract party from performing by some unlawful means; and (4) the plaintiff suffers damages. (*Id.* ¶ 13.) Although Nigerian law contains no analogue for California's common law claim of unfair competition, (*id.* ¶ 12) "'[t]he availability of an adequate alternative forum does not depend on the existence of the *identical* cause of action in the other forum,' nor on identical remedies." *Norex Petroleum, Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 158 (2d Cir. 2005) (emphasis

11

added).

C.    **Other Considerations**

      We next examine plaintiff's contentions that the Nigerian forum is inadequate because: (1) Nigerian courts will not fairly and correctly adjudicate the case; and (2) its employees would be at risk of physical harm if the case were tried in Nigeria.  (*See* Pl. Mem. Opp. Mot. Dismiss at 18, 21 (citing United States Department of State travel advisory, available at www.travel.state.gov).) Plaintiff's claimed "inconsistencies" in the manner in which the Nigerian trial court held that there was no contract for the purchase of ALSCON between plaintiff and the Nigerian government are insufficient to render Nigeria an inadequate forum.  At best, plaintiff's assertions, as well as those of its Nigerian legal expert, amount to little more than a disagreement with the result reached by the trial court, which we have no basis to question.[8]  (*See generally* Ilegbune Decl.) Moreover, the Second Circuit "[has] been reluctant to find foreign courts corrupt or biased," absent some particularized showing of wrongdoing.  *Monegasque De Reassurances S.A.M. (Monde Re) v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 499 (2d Cir. 2002).  Plaintiff's disagreement with the decision of the trial court on an issue of Nigerian law certainly does not rise to this level.  As Judge Haight observed in a similar context:

> [P]laintiff's preference for an American court cannot be indulged on the basis of an American judge's speculation that his Israeli colleagues would violate their oaths of office. . . . [I]t will be a black day for comity among sovereign nations when a court of one country, because of a perceived "negative predisposition," declares the incompetence or worse of another nation's judicial system.

_____

    [8] In its Opinion, dated November 23, 2005, the Nigerian Federal High Court, Abuja Division, held that initial bids did not form a binding contract.  (*See generally* Omo Decl., Ex. A.) It further held that, although the parties continued to negotiate the terms of the ALSCON purchase following the bidding process, no contract was formed because the parties never signed a written agreement. (*Id.*)

*Flores v. S. Peru Copper Corp.*, 253 F. Supp. 2d 510, 539 (S.D.N.Y. 2002). If plaintiff has so little

confidence in Nigerian justice, it is difficult to understand why it is so interested in acquiring an

industrial plant whose successful operation will necessarily be dependent on fair application of the

laws.

       Plaintiff also contends that litigation in Nigeria would subject its employees to physical

danger. Courts may, of course, properly consider the safety of litigants when ruling on a motion to

dismiss for *forum non conveniens. See generally, e.g., HSBC USA, Inc. v. Prosegur Paraguay, S.A.*,

No. 03 Civ. 3336, 2004 U.S. Dist. LEXIS 19750 (S.D.N.Y. Sept. 30, 2004). In *HSBC*, the court held

that Paraguay was an inadequate alternative forum because, *inter alia*,

> [an HSBC investigator], was repeatedly followed and found listening devices that
> had been hidden in his hotel room. . . . He was later chased by a vehicle whose
> occupants had their weapons drawn and aimed at [him]. During the course of his
> investigation, [the investigator] learned that five people connected with the robbery
> or the investigation [that precipitated the lawsuit] ha[d] been murdered or ha[d] died
> under suspicious circumstances, including the lead prosecutor in the robbery
> investigation and the police chief in charge of the investigation.

2004 U.S. Dist. LEXIS 19750, at *8-9. In the present case, plaintiff offers only generalized

statements regarding instability in the region in support of its safety argument. Under the

circumstances, which include plaintiff's extensive litigation of its contractual dispute in Nigerian

court, as well as its significant efforts to engage in the operation of a multimillion dollar facility

within Nigeria, we find this argument unpersuasive. Accordingly, we conclude that the courts of

Nigeria constitute an adequate alternative forum.

III.    **Public and Private Interest Factors**

    A.    **Public Interest Factors**

       We begin with a discussion of the public factors relevant to ruling on a motion to dismiss for *forum non conveniens*, as set forth by the United States Supreme Court in *Gilbert*, 330 U.S. at 508-09 and *Piper*, 454 U.S. at 241 n.6. These factors include: " [(1)] the administrative difficulties flowing from court congestion; [(2)] the local interest in having localized controversies decided at home; [(3)] the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; [(4)] the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and [(5)] the unfairness of burdening citizens in an unrelated forum with jury duty." *Piper*, 454 U.S. at 241 n.6 (internal quotation marks omitted; citations omitted.). In the present case, the public interest factors militate in favor of dismissal.

       Although the courts in the Southern District of New York are heavily congested, *see PT United Can Co. v. Crown Cork & Seal Co.*, No. 96 Civ. 3669, 1997 U.S. Dist. LEXIS 692, at *25 (S.D.N.Y. Jan. 28, 1997), *aff'd*, 138 F.3d 65 (2d Cir. 1998), it is well-accepted that the Southern District of New York has the resources to adjudicate complex litigation such as the present action. *See HSBC*, 2004 U.S. Dist. LEXIS 19750, at *6 n.1 (noting that "the Court of Appeals made clear that this consideration [court congestion] is not relevant within the Second Circuit as long as all judicial vacancies are filled, resulting in a 'full complement of judges for the District.'"); *Miller v. Calotychos*, 303 F. Supp. 2d 420, 429 (S.D.N.Y. 2004) ("The Court is not prepared to make subjective or conclusory comparative assessments of docket congestion here as opposed to London, or of the relative speed with which the matter may be resolved in either venue. Suffice it to say that, with the parties cooperation and good will, the Court can schedule a trial on the merits within a

14

reasonable period following the completion of all discovery or rulings on any dispositive motions."). Additionally, scant information regarding the dockets of the appropriate alternative Nigerian venues has been presented to the Court, and although that information is generally neutral, this factor militates slightly against dismissal.

The second factor, namely, the interest in having disputes resolved locally, militates in favor of dismissal. The bidding process occurred in Nigeria, as well as the alleged corruption of several high-ranking officials in the Nigerian government, including the President of the Federal Republic of Nigeria. The property that was the subject of the bidding is located wholly within Nigeria. Conversely, this district has only marginal interest in the instant case, as its only connection to either the parties or the subject matter of the dispute is the local office of RUSAL's American subsidiary, whose role, if any, in the present matter is disputed and who is named merely as an alter ego.

Evaluation of the third and fourth factors requires a brief examination of the appropriate choice of law rules, as the applicable substantive law is the subject of considerable dispute. We note that, if we were to adjudicate the present case, we would, as a federal court sitting in diversity jurisdiction, be bound to apply the choice of law rules of our forum state. *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 284 (2d Cir. 2006).

> In the context of tort law, New York utilizes interest analysis to determine which of two competing jurisdictions has the greater interest in having its law applied in the litigation. The greater interest is determined by an evaluation of the facts or contacts which . . . relate to the purpose of the particular law in conflict. . . . Two separate inquiries are thereby required to determine the greater interest: (1) what are the significant contacts and in which jurisdiction are they located; and (2) whether the purpose of the law is to regulate conduct or allocate loss.
>
> . . . .
>
> [With regard to] the second inquiry, a distinction must be made between a choice-of-law analysis involving standards of conduct and one involving the allocation of losses . . . .
>
> . . . .

15

> Conduct-regulating rules have the prophylactic effect of governing conduct
> to prevent injuries from occurring. If conflicting conduct-regulating laws are at issue,
> the law of the jurisdiction where the tort occurred will generally apply because that
> jurisdiction has the greatest interest in regulating behavior within its borders . . . .

*Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 521-22, 644 N.E.2d 1001, 620 N.Y.S.2d 310 (1994)

(internal quotation marks omitted; citations omitted).  Additionally, New York courts look for

guidance to the factors listed in section 145 of the Restatement of the Law (2nd) Conflict of Laws (the

"Restatement").  *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 195, 480 N.E.2d 679, 491

N.Y.S.2d 90 (1985); *Condit v. Dunne*, 317 F. Supp. 2d 344, 353 (S.D.N.Y. 2004) (citing *Davis v.

Costa-Gavras*, 580 F. Supp. 1082, 1091 (S.D.N.Y. 1984) ("New York courts recognize the utility

of a contacts analysis, similar to that suggested by section 145 of the Restatement, in tort actions

involving multistate elements.") (collecting cases)).

Section 145 of the Restatement provides:

> The rights and liabilities of the parties with respect to an issue in tort are determined
> by the local law of the state which, with respect to that issue, has the most significant
> relationship to the occurrence and the parties . . . .
>     Contacts to be taken into account . . . include: (a) the place where the injury
> occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil,
> residence, nationality, place of incorporation and place of business of the parties, and
> (d) the place where the relationship, if any, between the parties is centered.

Considering the foregoing authority, it appears that New York courts would apply Nigerian

law to the present case.  Setting aside, for the moment, the issue of where the injury occurred, it is

clear that the conduct causing the injury occurred within the Federal Republic of Nigeria, which was

the place where the parties' relationship was centered.  All of the allegedly tortious acts, namely

manipulation of the ALSCON bidding process and corruption of government officials, in Nigeria.

Moreover, none of the alleged tortfeasors has taken *any* action within the state of California.

As previously stated, the *Padula* court also inquired as to whether the purpose of the laws

16

at issue is to regulate conduct or allocate loss.  84 N.Y.2d at 522.  Clearly, the laws at issue herein

regulate standards of conduct, and accordingly, courts are predisposed to apply the law of the place

in which the tort occurred.  Plaintiff thus urges that California law applies, relying on language

employed by the New York Court of Appeals language in *Schultz*,  in which it stated:

> Under traditional rules, the law of the place of the wrong governs all substantive
> issues in the action . . . but when the defendant's [tortious] conduct occurs in one
> jurisdiction and the plaintiff's injuries are suffered in another, the place of the wrong
> is considered to be the place where the last event necessary to make the actor liable
> occurred . . . .  Thus, the locus . . . is determined by where the plaintiffs' injuries
> occurred.

65 N.Y.2d at 195 (citations omitted).  In the present case, plaintiff contends, its alleged economic

injuries were sustained in California, plaintiff's state of incorporation and principal place of business.


 *Schultz*, however, was an action to recover for personal injuries, whereas the present case

involves purely monetary harm caused by conduct that took place entirely within another country.

Courts of this district have "regarded the place where the victim of fraud or negligence suffered

economic loss as less significant for choice of law purposes than the law of the place [in which the

alleged conduct took place]" where, as here, a plaintiff intentionally entered a foreign jurisdiction

to transact business and could only have operated under the assumption that the law of Nigeria

governed its actions.  *Sussman*, 801 F. Supp. at 1075; *see also Saab v. Citibank, N.A.*, No. 00 Civ.

6784, 2001 U.S. Dist. LEXIS 18115, at *19 (S.D.N.Y. Nov. 7, 2001) ("Since the present case entails

conduct-regulating laws and the parties are domiciled in different countries, the locus of the tort will

be determinative.  Plaintiffs claim that New York should be the locus of the tort because decisions

regarding the fate of their project were made at Citibank headquarters in New York.  However,

London was the locus of the majority of the actions, from negotiations through promotion of the

17

investment, relevant to the tort claims in this case. The misrepresentations allegedly made by Citibank occurred during negotiations in London, and the alleged tortious injuries were caused, if not directly in England, by [the English office of Citibank's affiliate]. Since the alleged fraudulent actions occurred in England, England is the locus of the tort. Since England has the greatest interest in this case, under New York law English law would be applied to the tort claims."), *aff'd*, 50 F. App'x 467 (2d Cir. 2002) ; *Guildhall Ins. Co., Ltd. v. Silberman*, 688 F. Supp. 910, 913 (S.D.N.Y. 1988) (applying New York law in diversity action for fraud involving insurance policy issued in New York and stating: "[E]ven if [the plaintiff's] alleged injury took place in New Jersey this contact is not a sufficient reason to apply to New Jersey law in this action."). Thus, there is scant basis for the application of California law to the present. Accordingly, the third and fourth public interest factors militate strongly in favor of dismissal. Although federal courts are capable of applying foreign law, the courts of Nigeria are obviously more adept at applying the laws of their own nation to events that transpired therein.[9]

The fifth factor, namely the unfairness of burdening citizens in an unrelated forum with jury duty, also weighs slightly in favor of dismissal. Although RUSAL America, a Delaware corporation with its principal place of business in New York, has been named as a defendant, its continued presence in the matter is far from certain.[10] The action essentially amounts to a dispute between California and Russian companies over their interactions with the Nigerian government concerning

---

[9] Although it was invited to do so, the United States Department of State declined to file a brief as *amicus curie*.

[10] Defendants dispute plaintiff's allegation that RUSAL America is the alter ego of its corporate codefendants and have objected to plaintiff's attempt to obtain jurisdiction over RUSAL and Bratsk on that basis. (Defs. Mem. Supp. Mot. Dismiss at 33-38.)

18

the purchase of Nigerian government property.  A New York jury therefore has little interest in adjudicating it.  This factor thus militates in favor of dismissal.

In summary, the first factor but militates slightly in favor of retaining jurisdiction.  The remaining factors, however, militate, some of them strongly, in favor of dismissal.


**B.**     **Private Interest Factors**

The factors examined by the Court relating to the private interests of the litigants include: "[(1)] the relative ease of access to sources of proof; [(2)] availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; [(3)] possibility of view of premises, if view would be appropriate to the action; [(4)] and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Piper*, 454 U.S. at 241 n.6 (internal quotation marks omitted; citations omitted).  Like the public interest factors, these factors also militate strongly in favor of dismissal.

Turning to the first and second factors, we note that the bulk of the relevant non-testimonial evidence, consisting largely of bid documents and, presumably, internal memoranda generated by the BPE, is located either within plaintiff's control or in the offices of various agencies of the government of the Federal Republic of Nigeria.  More significantly, as defendants rightly observe, plaintiff's Complaint lists several non-party witnesses employed by the Nigerian government and living within Nigeria.  (Defs. Mem. Supp. Mot. Dismiss at 14.) These witnesses consist of the top echelon governmental officers, including: (1) Olusegun Obasanjo, President of the Federal Republic of Nigeria; (2) Abubakar Atiku, Vice President of the Federal Republic of Nigeria; (3) Julius Bala, Director General of the BPE; (4) Ibrahim Mantu, Deputy President of the Nigerian Senate; (5) Akin

19

Kekere-Ekun, Chairman of the Technical Subcommittee of the National Council on Privatization; (6) Liyel Imoke, Nigerian Senator and Minister of Power and Steel; (7) Aliyu Gusau,[11] National Security Advisor to President Obasanjo and General, Nigerian Army.[12] (*Id.*; Complt. ¶¶ 55-137.) Plainly, this Court lacks any authority to compel the attendance of these witnesses. Plaintiff, for its part, argues that many United States-based witnesses are no longer within its employ and thus cannot be easily produced for trial in Nigeria. (Pl. Mem. Opp. Mot. Dismiss at 19.) Nevertheless, many of these persons, such as former members of plaintiff's board of directors, would undoubtedly provide testimony duplicative of that of other officials still with the company. For example, to the extent that members of plaintiff's legal team that negotiated with the Nigerian government are no longer in its employ, the testimony of plaintiff's Chief Legal Officer, who was personally involved in such negotiations, would certainly be sufficient.

Plaintiff also suggests that the testimony of the Nigerian witnesses could be procured through depositions taken pursuant to letters rogatory. (*Id.*) Although we acknowledge that letters rogatory are an important and, indeed, historic part of international litigation, *see United States v. Mosby*, 133 U.S. 273, 282 (1890), "such a process has been recognized as time-consuming, and there is, of course, a preference for live testimony." *Gilstrap v. Radianz Ltd.*, 443 F. Supp. 2d 474, 488 (S.D.N.Y. 2006); *but see DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 30 (2d Cir. 2002) ("Despite the preference for live testimony, we have recognized the availability of letters rogatory as relevant

---

[11] An internet search appears to reveal, however, that General Gusau may have recently passed away.

[12] Plaintiff's Complaint also makes reference to several unnamed members of the Nigerian government who appear to be potential witnesses, including one "Senior Official of the Nigerian Government," and "some Presidency officials." (Complt. ¶¶ 55, 82, 98.)

in deciding whether plaintiffs' chosen forum is inconvenient. . . . Yet considering the number of witnesses for whom these accommodations would have to be made and the preference for live testimony, the district court did not abuse its discretion when it found this factor weighs in favor of defendants.") (citations omitted).  Moreover, in the present matter, substantial portions of plaintiff's case in chief would have to be presented in the form of letters rogatory were it tried in the Southern District of New York, for not only are numerous key witnesses located in Nigeria, but RUSAL's agents—that is, those who effectuated the alleged torts—apparently are located within the Russian Federation.  Indeed, although RUSAL America is named as a defendant, plaintiff has made no indication that any of its agents played even a marginal role in the ALSCON bidding process.  With regard to this last observation, we note that the Nigerian courts would be better equipped than this Court to exercise jurisdiction over potential Russian witnesses due to the presence within the jurisdiction of RUSAL itself, and not a mere subsidiary with no apparent involvement in the activities in question.  (*See* Feb. 26, 2006 Letter of Jimmie L. Williams) (informing the Court that RUSAL took control of the ALSCON compound effective February 27, 2007).[13]

        The fourth factor, namely, other practical considerations, such as convenience and expense, is in equipoise.  Obviously, trial in this Court would be more convenient and less expensive for plaintiff, but less convenient and more expensive for defendants.

        Thus, in summary, the first and second private interest factors militate strongly in favor of dismissal.  The third factor is factually inapposite and the fourth is neutral.

---

        [13] The third factor is inapposite in the present matter because inspection of the aluminum plant would not be helpful in resolving the issues in the case.

21

## CONCLUSION

For all the foregoing reasons, we conclude that the courts of Nigeria constitute an adequate alternative forum and that the applicable public and private interest factors mandate dismissal of the action pursuant to the doctrine of *forum non conveniens*. Accordingly, the motion of defendants JSC Russian Aluminum d/b/a RUSAL, JSC Bratsk Aluminum Plant, RUSAL America Corp., Dayson Holding Ltd. and "Does 1-20" to dismiss the action is granted. In order to prevent prejudice to plaintiff, dismissal is conditioned on defendants' submitting to the Court within fourteen days of the entry of this Opinion and Order a stipulation with respect to the claims pleaded in plaintiff's Complaint agreeing to: (1) submit to jurisdiction and waive service of process in a Nigerian court; and (2) waive any statute or other law of limitations that would otherwise apply under Nigerian law to any action hereafter brought by plaintiff in a Nigerian court.


SO ORDERED.

Dated: White Plains, New York
        March 23, 2006 7

_____
Sr. United States District Judge

22